UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

SHEILA M. KEMP,                                          :

                Plaintiff,                          :          <u>OPINION AND ORDER</u>
                                               15 Civ. 5005 (GWG)

               -against-                          :

COMMISSIONER OF SOCIAL SECURITY,                          :

                Defendant.                          :
------------------------------------------------------------------x

GABRIEL W. GORENSTEIN, United States Magistrate Judge

      Plaintiff Sheila Kemp brings this action pursuant to 42 U.S.C. § 405(g) and 1383(c) to

obtain judicial review of the final decision of the Commissioner of Social Security denying her

claim for disability insurance benefits under the Social Security Act (the "Act"). Both Kemp

and the Commissioner have moved for judgment on the pleadings pursuant to Fed. R. Civ. P.

12(c).[1] For the reasons stated below, the Commissioner's motion is granted and Kemp's motion

is denied.

I.      <u>FACTUAL BACKGROUND</u>

      A.      <u>Procedural History</u>

---

[1]  <u>See</u> Plaintiff's Motion for Judgment on the Administrative Record and Pleadings
Pursuant to Fed. R. Civ. P. 12(c), filed Dec. 7, 2015 (Docket # 16); Plaintiff's Memorandum of
Law, filed Dec. 7, 2015 (Docket # 17) ("Pl. Mem."); Notice of Motion for Judgment on the
Pleadings, filed Jan. 4, 2016 (Docket # 23); Memorandum of Law in Support of the
Commissioner's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's
Motion for Judgment on the Pleadings, filed Jan. 4, 2016 (Docket # 24) ("Comm. Mem.");
Plaintiff's Memorandum of Law in Reply to Defendant's Response to Plaintiff's Motion for
Judgment on the Pleadings and in Opposition to Defendant's Cross-Motion for Judgment on the
Pleadings, filed Jan. 25, 2016 (Docket # 25) ("Pl. Reply"); Letter to Judge Gabriel W.
Gorenstein from David J. Kennedy, filed Feb. 9, 2016 (Docket # 26) ("Comm. Reply"); SSA
Administrative Record, filed Sept. 3, 2015 (Docket # 14) ("R.").

On August 30, 2012, Kemp filed a claim for disability benefits with an alleged onset date of June 10, 2011.  R. 23.  Her claim was denied on December 19, 2012.  Id.  On January 3, 2013, Kemp requested a hearing before an administrative law judge ("ALJ").  Id.  The hearing took place on October 15, 2013, before ALJ Katherine Edgell.  R. 23, 34.  Kemp, who appeared with attorney Jason Cook, testified at the hearing, along with vocational expert Helene J. Feldman.  R. 23.  After the hearing, and as further described below, the ALJ admitted additional evidence into the record regarding Kemp's claim.  Id.  This included a report from Kemp's treating physician, Dr. Amanda Ganem.  R. 32, 910-15.  On February 24, 2014, the ALJ issued a decision finding that Kemp did not qualify for benefits.  R. 23-34.  The Appeals Council upheld the decision on appeal, making the ALJ's decision the final decision of the Commissioner.  R. 1-5.  Kemp then filed the instant action seeking review of that determination.  See Complaint, filed June 26, 2015 (Docket # 1).

B.      The Administrative Record

Kemp and the Commissioner have each provided a summary of the medical evidence contained in the administrative record.  See Pl. Mem. at 2-6; Comm. Mem. at 2-10.  The Court adopts the parties' summaries, which do not conflict in any material way, as accurate and complete for purposes of the issues raised in this suit.  We discuss the portions of the medical record pertinent to the adjudication of this case in section III below.

C.      Hearing Before the ALJ

At a hearing held on October 15, 2013, Kemp testified before the ALJ.  R. 39-82.  Kemp was born in 1952 and lives with her adult son.  R. 42-43.  Kemp is 5 feet 2 inches tall and weighs 180 pounds.  R. 43.  She is a high school graduate and has completed two years of college.  R. 44.  She is proficient in computers, software, and the operation of standard office equipment.  Id.

2

Prior to the alleged onset of her disability, Kemp worked as an administrative assistant.  R. 45, 72-73.  Kemp left on June 10, 2011, and has not worked since.  R. 45.  At the time she left, the company was "downsizing" and had offered employees the option of a "buyout."  R. 68.  Kemp decided to take the buyout due to "health reasons."  R. 46, 68.  After accepting the buyout, Kemp sought alternative employment and sent out "hundreds of resumes," while she was "trying to build [her] body back up."  R. 63.  She later determined, however, that her "energy level and . . . cognitive functioning" were not improving, and that she was "getting sicker," which limited her ability to work.  R. 62-63.

Kemp testified that she could no longer work because of liver complications related to Hepatitis C, fatigue, back pain, high blood pressure, and diabetes.  R. 46-47, 50-51.  She testified regarding the limitations these impairments created.  Kemp stated that she spends most of the day sitting down at home, often knitting.  R. 59.  She can walk up to 8 blocks and stand for 5 minutes on a "memory mat."  R. 53, 60.  She can lift up to 20 pounds with difficulty.  R. 60.  She does not participate in community activities and generally does not travel.  R. 57.  During the period at issue, however, she did fly to the State of Washington to meet her birth father and later traveled to New Jersey for her son's wedding.  Id.  Kemp takes medication to treat her symptoms, but it makes her feel dizzy.  R. 56.  She has also received epidural injections to treat pain in her neck and back.  R. 53.

The ALJ also heard testimony from vocational expert Helene J. Feldman, who testified that Kemp's past relevant work as an administrative assistant had a "DOT code" of "169.167-10" and was a "sedentary" position.  R. 75.  The ALJ also questioned the vocational expert regarding the exertional abilities of a hypothetical person with various limitations.  See R. 75-81.

As described further below, at the conclusion of the hearing, the ALJ requested that

plaintiff's counsel provide a more legible copy of a report purportedly prepared by Dr. Ganem, which had been faxed to the ALJ by Kemp's attorney.  R. 50, 81.

      D.    <u>The ALJ's Decision</u>

On February 24, 2014, the ALJ ruled that Kemp was not disabled from June 10, 2011, through the date of her decision.  R. 33.  In her decision, the ALJ used the five-step sequential evaluation process described in the Social Security Regulations for determining whether an individual is disabled.  R. 24-25; 20 C.F.R. § 404.1520(a).  First, the ALJ found that Kemp met the insured status requirements of the Act through December 31, 2016.  R. 25.  Next, she found that Kemp had not engaged in substantial gainful activity since June 10, 2011, the alleged onset date of Kemp's disability.  <u>Id.</u>  The ALJ then found that Kemp suffered from the following severe impairments: "obesity, diabetes mellitus, coronary artery disease with a history of stenting, congestive heart failure, hypertension, hepatitis C, gastroesophageal reflux disease, mild disc bulge and facet arthropathy of the lumbar spine, and mild degenerative disc disease and disc bulge of the cervical spine."  <u>Id.</u>[2]  Next, the ALJ found that, notwithstanding these limitations, Kemp did "not have an impairment or combination of impairments that me[t] or medically equal[ed] the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  <u>Id.</u>

The ALJ determined that Kemp retained the residual functional capacity ("RFC") to

perform sedentary work as defined in 20 CFR 404.1567(a) except: She can sit up to 8 hours, stand up to 2 hours, and walk up to 1 hour.  She can continuously lift or carry up to 10 pounds, frequently lift or carry up to 20 pounds, and occasionally lift up to 50 pounds.  She can continuously use both hands for all activities.  She can frequently use

_____

[2]  The ALJ also determined that Kemp's "medically determinable mental impairment of depression," did not cause more than a minimal limitation on Kemp's ability to "perform basic mental work activities and is therefore nonsevere."  R. 26.

both feet for the operation of foot controls.  She can occasionally balance, stoop, and climb stairs and ramps.  She cannot kneel, crouch, crawl, or climb ladders and scaffolds. She can have frequent exposure to vibrations.  She can occasionally operate a motor vehicle and be exposed to moving mechanical parts, humidity and wetness, respiratory irritants, and extreme cold.  She must avoid all exposure to unprotected heights and extreme heat.

R. 28.

The ALJ then summarized the medical evidence she relied upon in reaching this determination.  With regard to Kemp's heart impairments, the ALJ recognized that Kemp had been diagnosed with coronary artery disease, congestive heart failure, hypertension, and obesity. R. 29.  These problems, however, significantly predated the alleged onset of disability.  See id. The ALJ noted that in December 2007, Kemp reported to Dr. Wilmore Finerman that she had been experiencing "episodes of chest pain and shortness of breath."  Id.  Testing revealed that Kemp suffered from an anterior ischemia, for which Dr. Geoffrey Bergman performed a "catherization procedure and found triple vessel coronary artery disease," requiring the placement of two stents.  Id.  In January 2011, Kemp saw Dr. Amanda Ganem, who noted that Kemp had high cholesterol, high blood pressure of 180/100, hypertension, and was obese.  Id. Dr. Ganem recommended that Kemp lose weight and prescribed her with a diuretic to help with her hypertension.  Id.  During a later visit with Kemp's primary care physician, Dr. Friend, Dr. Friend noted that as of April 2011, Kemp's blood pressure had improved and fallen to 140/72. Id.  In June 2011, the month of the alleged onset of her disability, Kemp told Dr. Ganem that she had experienced better results from her recent prescription of Cozaar.  Id.  Dr. Ganem encouraged Kemp to continue walking as a form of exercise.  Id.  Kemp continued to improve, with her blood pressure dropping to 130/64.  Id.  In January 2012, however, Kemp returned to Dr. Ganem and reported further chest pain.  Id.   Nonetheless, Kemp's blood pressure

improvement was constant, and a myocardial perfusion stress test found no abnormalities,

beyond the "low likelihood of angiographically significant atherosclerotic coronary artery

disease." Id.  Although Kemp's chest pain receded by March 2012, in April 2012, Kemp

required emergency care for complications with her hypertension.  Id.  At the hospital, Dr.

Loretta Azuka Emenike noted that Kemp complained of chest pains, swollen hands, and

headaches, and that her blood pressure reached as high as 206/93.  Id.  Dr. Emenike prescribed

Aspirin, Nitroglycerin, and Clonidine, and by the time Kemp was released, later that day, only

her headache remained.  Id.  After her release from the hospital, Kemp was prescribed a number

of medications to help mitigate her symptoms, and she continued to improve, "ultimately joining

a gym and walking 1.5 miles per day." Id.

In October 2012, Kemp reported to Dr. Ganem that she was experiencing chest pressure.

Id.  Dr. Bergman performed a second catheterization, but found no abnormalities.  Id.  Soon

after, Dr. William Lathan performed a consultative examination of Kemp.  Id.  He found Kemp's

heart held a regular rhythm and determined she was "stable." Id.

Following the episode of chest pain, Kemp's blood pressure remained in her target range

into 2013.  R. 29-30.  Although Kemp continued to complain of sluggishness and chest pain, Dr.

Ganem suggested that they may be tied to impairments other than her chest complications.  R.

30.

With regard to Kemp's diagnosis of hepatitis C and gastroesophageal reflux disease, the

ALJ again noted that both impairments predated the alleged onset date and available record.  Id.

Based on Dr. Ganem's January 2011 report, the ALJ determined that, prior to the alleged onset

date, Kemp had already undergone interferon treatment for hepatitis C.  Id.  After the alleged

onset date, Kemp visited Dr. Marianne Monahan, who diagnosed her with chronic kidney

6

disease.  Id.  Dr. Monahan suggested that this problem was likely due to a combination of

Kemp's diabetes mellitus and hypertension, for which she encouraged Kemp to "obtain better

control" of her impairments and prescribed the diuretic Lasix.  Id.

      In July 2011, Kemp reported to Dr. Andrew Francella for another round of interferon

treatment.  Id.  Dr. Francella reported that Kemp "tolerated [the treatment] very well," but that it

had led to some fatigue.  Id.  The fatigue was later linked to Kemp's anemia, which was treated

with Procrit.  Id.  By December 2011, Dr. Monahan "observed that [Kemp's] edema had

stabilized," and instructed Kemp to continue her use of Lasix.  Id.  Kemp concluded her hepatitis

C treatment in January 2012, although some of her symptoms persisted.  Id.  She did not,

however, continue her use of interferon, and reported feeling better once off the treatment.  Id.

In August 2012, Dr. Monahan "noted that [Kemp's] renal functioning had worsened," which she

linked to the prescription "Metformin," and instructed Kemp stop using diabetic medication.

Id.  At this point, Kemp's abdomen "showed diffuse fatty infiltration of the liver[,] but no

hepatic cirrhosis," and Kemp "consistently denied gastrointestinal complications."  Id.

      The ALJ noted that Kemp suffered from diabetes and obesity.  Id.  In January 2011, Dr.

Ganem determined that Kemp's "diabetes [had] deteriorated."  Id.  Endocrinologist Dr. Randy

Stein evaluated Kemp and found her "hemoglobin A1c level over 10 percent."  Id.  This

impairment "resulted in diabetic retinopathy," but opthalmologist Dr. Lori Tindel-Kahn "found

no visual acuity problems."  Id.  By April 2011, Dr. Stein "noted that the diabetes appeared

under better control."  Id.  Kemp's blood glucose level was 109 and hemoglobin A1c 8.8%,

which further decreased to 8.0% by September 2011.  Id.  In February 2012, Kemp reported a

deterioration of her night vision.  Id.  Dr. Tindel-Kahn found her retinopathy stable, but

discovered "glaucoma and early cataracts."  Id.  By October 2012, Kemp's glucose readings had

reached 241 and she was prescribed Lantus.  Id.  She later restarted her use of Metformin.  Id.

With respect to Kemp's "pain-related impairments," the ALJ noted that Kemp had reported leg, lower back pain, and occasional muscle spasms when she spoke with Dr. Friend. R. 31.  Kemp indicated that her pain began in her "left neck and shoulder . . . [and] radiated into the hand," which limited her finger strength.  Id.  In September 2012, Kemp saw orthopedist Dr. Young Don Oh, who performed a physical examination of Kemp.  Id.  Dr. Oh found that Kemp reported pain upon left shoulder elevation of 90 degrees, but that "X-rays of the joint proved negative."  Id.  He diagnosed "the pain as an impingement," and provided Kemp with an injection of Depo-medrol.  Id.  Kemp reported limited relief and returned to Dr. Oh in October 2012 for further treatment.  Id.  Dr. Oh then diagnosed Kemp's ailments as "rotator cuff syndrome and degenerative disc disease of the cervical spine," for which he provided a second injection of Depo-Medrol.  Id.

The ALJ also reviewed Dr. Lathan's November 2012 consultative examination, in which Kemp complained of musculoskeletal pain.  Id.  X-Rays performed by Dr. Lathan "showed degenerative joint disease and mild degenerative spondylosis at C5-C6."  Id.  However, Dr. Lathan noted that Kemp maintained a "full range of motion in the cervical and lumbar spine," and "exhibited negative straight-leg raising tests, normal shoulder range of motion, and full strength in all extremities."  Id.

The ALJ noted that Kemp received treatment from pain specialist Cy Blanco, M.D. in January 2013.  Id.  Dr. Blanco diagnosed Kemp with "mild right facet arthropathy between C2 and C4, mild central canal stenosis at C4-C5, and mild central canal stenosis at C5-C6."  Id.  He provided Kemp with an epidermal steroid injection in the cervical spine, but it provided only temporary relief.  Id.  In March 2013, Kemp again met with Dr. Blanco, who diagnosed her with

"lumbar radiculopathy," and prescribed her with Acetaminophen with codeine.  Id.  The ALJ

suggested that although Kemp reported continual pain during this period, in June 2013, she

maintained "full strength in all tested muscles."  Id.

      Based on the medical evidence described above and considering the relevant testimony

provided at the hearing, the ALJ determined that although the symptoms Kemp described "could

reasonably be expected to cause the alleged symptoms," her "statements concerning the

intensity, persistence and limiting effects of these symptoms [were] not entirely credible."  Id.

Specifically, the ALJ noted that although Kemp reported that she had "left her last job due to

declining health," she acknowledged that her departure occurred during a period of company

downsizing, and reported at the hearing that she had continued to submit "hundreds of resumes,"

well past the alleged onset date.  R. 31-32.  The ALJ also highlighted that Kemp's "diabetes,

hypertension, and cardiovascular impairments" had stabilized, and that her hepatitis C had not

been linked to any liver cirrhosis.  R. 32.  Finally, with regard to Kemp's musculoskeletal

impairments, the ALJ recognized that these impairments had worsened during the relevant

period, but that nevertheless, Kemp maintained the ability to "pursue full and varied activities,"

which included "walking, standing in lines, and sitting in planes or cars."  Id.  The ALJ noted

Kemp's flight to Washington and her trip to New Jersey as examples of her mobility.  Id.

Furthermore, the ALJ referenced Kemp's ability to "drive a car, maintain her hygiene . . .

prepare meals," and knit on a daily basis.  Id.

      The ALJ then discussed the opinion evidence.  She awarded "great weight" to Dr.

Ganem's opinion that Kemp "is capable of low stress jobs that primarily involve sitting."  Id.

Specifically, Dr. Ganem determined that Kemp could "lift up to 50 pounds and perform

occasional posturals[] but is restricted to standing for 2 hours and walking for 1 hour per

workday." Id.  The ALJ noted that her decision to grant great weight to Dr. Ganem's opinion

relied in part on her "treating relationship" with Kemp.  Id.  Next, the ALJ granted "some

weight" to the opinion of consultive examiner Dr. Lathan, because of its "apparent consistency

with Dr. Ganem['s]."  Id.

    The ALJ also granted "some weight" to the state agency consultant, who determined that

Kemp was restricted to "light work."  Id.  The degree of weight she granted this opinion was

limited due to the fact that the consultant "did not have the opportunity to examine the claimant."

Id.  Finally, the ALJ granted "no weight" to the opinion identified as "Exhibit 9F," because it

was "largely illegible."  Id.  To the extent some pieces of the opinion were legible, the ALJ

granted them no weight as the opinion overall was "inadequate," as the physician signature was

"unclear."  Id.  The ALJ recognized, however, that the opinion was "reportedly from Dr.

Ganem," which led the ALJ to hold the record open for the submission of a "legible, signed

copy," of the report.  Id.  Instead, Dr. Ganem provided the ALJ with a new opinion, which, as

noted above, the ALJ granted "great weight."  Id.

    In the final step of her analysis, the ALJ determined that Kemp was "capable of

performing past relevant work as an administrative assistant," which aligned with the abilities

found in the ALJ's RFC determination.  R. 33.  The ALJ referred to the vocational expert's

testimony that Kemp's previous work was categorized under the Dictionary of Occupational

Titles ("DOT") as "sedentary, skilled work . . . ."  Id.  She also noted that Kemp performed this

type of work at the "medium exertional level."  Id.  The ALJ recognized, however, that the

vocational expert "did not have the opportunity to testify about the limitations found in the

residual functional capacity, which developed from evidence submitted after the hearing."  Id.

Nevertheless, the ALJ determined that Kemp maintained the ability to

sit up to 8 hours, stand up to 2 hours, and walk up to 1 hour[,] [which] is consistent with the sedentary job description.  Her lifting and carrying ability exceeds the requirement for such work. [Kemp's] ability to continuously use her hands surpasses the frequent requirements found in the DOT.  The job description does not include any of the postural limitations found in the residual functional capacity[,] [and] [t]he only acknowledged environmental concern is moderate noise level.

Id.  Accordingly, the ALJ determined that Kemp was "able to return to work as an administrative assistant," and was not under a disability as defined by the Act.  Id.

II.   APPLICABLE LAW

A.    Scope of Judicial Review Under 42 U.S.C. §§ 405(g) and 1383(c)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citation and quotation marks omitted); accord Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); id. § 1383(c)(3) ("The final determination of the Commissioner of Social Security . . . shall be subject to judicial review as provided in section 405(g) . . . .").  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); accord Burgess, 537 F.3d at 127-28; Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per

curiam) (citation and internal quotation marks omitted).  Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists."  Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)); accord McIntyre v. Colvin, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.") (citation omitted).  The Second Circuit has characterized the "substantial evidence" standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447-48 (2d Cir. 2012) (per curiam) (citation omitted).  "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise."  Id. at 448 (emphasis in original) (citation and internal quotation marks omitted).  "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision."  Johnson, 563 F. Supp. 2d at 454 (citation and internal quotation marks omitted).

      B.    Standard Governing Evaluation of Disability Claims by the Agency

      The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); accord id. § 1382c(a)(3)(A).  A person will be found to be disabled only if it is determined that his "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy." Id. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To evaluate a claim of disability, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. See 20 C.F.R. § 404.1520(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," id. § 404.1520(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," id. § 404.1520(c). Third, if the claimant's impairment is severe and "meets or equals" one of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1, and "meets the duration requirement," the claimant must be found disabled. Id. § 404.1520(a)(4)(iii). Fourth, if the claimant's impairment does not meet or equal one of the listed impairments, or does not meet the duration requirement, the Commissioner must review the claimant's residual functional capacity to determine if the claimant is able to do the work he or she has done in the past, i.e., "past relevant work." Id. § 404.1520(a)(4)(iv). If the claimant is able to do such work, he or she is not disabled. Id. Finally, if the claimant is unable to perform past relevant work, the Commissioner

13

must decide if the claimant's residual functional capacity, in addition to his or her age,

education, and work experience, permit the claimant to do other work.  Id. § 404.1520(a)(4)(v).

If the claimant cannot perform other work, he or she will be deemed disabled.  Id.  The claimant

bears the burden of proof on all of these steps except the final one — that is, proving that there is

other work the claimant can perform.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009)

(per curiam).

III.    DISCUSSION

Kemp seeks reversal or remand of the ALJ's decision on the grounds that (1) the ALJ

failed to grant appropriate weight to an opinion purportedly produced by Dr. Ganem; (2) the

ALJ's credibility determination was not supported by substantial evidence; and (3) the ALJ's

determination that Kemp could perform her past relevant work as an administrative assistant was

not supported by substantial evidence.  We address each argument in turn.

A.    The Treating Physician Rule

In determining whether a claimant is disabled, a treating physician's opinion is entitled to

controlling weight if it is "well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.

20 C.F.R. § 416.927(c)(2).  Under this rule, the Commissioner is not required to give deference

to the treating physician's opinion where the treating physician "issued opinions that are not

consistent with other substantial evidence in the record, such as the opinions of other medical

experts."  Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (citation omitted).

Moreover, "the less consistent [a treating physician's] opinion is with the record as a whole, the

less weight it will be given."  Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citing 20 C.F.R.

§ 404.1527(d)(4)); see also Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine

conflicts in the medical evidence are for the Commissioner to resolve.") (citation omitted).

If the ALJ does not give controlling weight to a treating physician's opinion, the ALJ must provide "good reasons" for the weight given to that opinion. Halloran, 362 F.3d at 32-33 (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)) (internal quotation marks omitted). When assessing how much weight to give the treating source's opinion, the ALJ should consider factors set forth in the Commissioner's regulations, which include: (I) the length of the treatment relationship and the frequency of the examination; (ii) the nature and extent of the treatment relationship; (iii) the supportability of the opinion with relevant evidence, particularly medical signs and laboratory findings; (iv) the consistency of the opinion with the record as a whole; (v) whether the opinion is from a specialist; and (vi) other relevant evidence. See 20 C.F.R. §§ 404.1527(c), 416.927(c); see also Ellington v. Astrue, 641 F. Supp. 2d 322, 330-31 (S.D.N.Y. 2009) ("the ALJ should weigh the treating physician's opinion along with other evidence according to the factors" listed in 20 C.F.R. § 404.1527(c)(2)-(6)).

The plaintiff's argument regarding the treating physician rule relates to the ALJ's decision to ignore entirely a document dated in January 2013 — identified as Exhibit 9F — that purportedly emanated from Dr. Ganem's office. R. 673-78 (the "January 2013 Opinion"). The January 2013 Opinion consists of a form headed "Cardiac Residual Functional Capacity Questionnaire." R. 673. Dr. Ganem's name is written at the top as the individual to whom the form is addressed. Id. Kemp's name and social security number are also listed. Id. It cannot be determined from the form whether these items were filled in by the person who presented the form to Dr. Ganem or by someone else.

The remainder of the form, however, contains a number of illegible portions, including the signature and the name and address of the person who filled it out. R. 678. While there are

15

many illegible portions, Kemp stresses that some portions showing restrictions are legible — for example, a statement that the patient will need to take 2 to 3 unscheduled 15-minute breaks during an 8-hour period.  R. 676.

The form apparently was faxed to the agency by plaintiff's attorney.  R. 50.  At the hearing, the ALJ asked the attorney if he had a hard copy somewhere in his office.  Id.  The attorney said he would "double check" and suggested that someone might "have another one completed."  R. 51.  At the end of the hearing, the attorney indicated he would look for a legible copy and return it in about "a week."  R. 81-82.

Shortly after the hearing, on October 15, 2013, the ALJ sent Dr. Ganem a letter asking her to "fill out the attached Physical RFC."  R. 908-09.  The record contains what appears to be the filled-out version of the form that was attached to the ALJ's October 15, 2013, letter.  That form is entitled "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" and is dated October 18, 2013 (the "October 2013 Opinion").  R. 910-15.   It is signed by Dr. Ganem.  R. 915.  There is no evidence that plaintiff's attorney ever provided the ALJ with a legible copy of the January 2013 Opinion.

In his decision, the ALJ relied on the October 2013 Opinion and discounted the January 2013 Opinion entirely because much of the form and the signature were illegible.  See R. 32, 678.

Kemp contends that the ALJ's decision to afford no weight to the January 2013 Opinion was error and that the ALJ should have considered the legible portions of that report.  Kemp does not argue that the ALJ had an obligation to develop the record by contacting Dr. Ganem regarding any inconsistency between the two documents.  Kemp's argument is solely that the partially illegible document constituted an opinion of a treating source that had to be given

NEVER

deference under the regulations.  Pl. Mem. at 8-12.  Kemp also does not argue that the ALJ's

RFC determination is otherwise unsupported by substantial evidence.  Indeed, such an argument

would fail inasmuch as the medical opinion evidence in the record is consistent in its support of

the ALJ's ultimate RFC determination.  See, e.g., R. 656-59 (Dr. Lathan's November 2012

consultative examination); R. 662-63 (New York State Division of Disability Determinations

December 2012 report); R. 910-15 (Dr. Ganem's October 2013 opinion).

We do not fault the ALJ for her decision not to rely on the January 2013 Opinion,

notwithstanding the fact that it contained some legible portions along with the illegible ones.

Case law holds that where an opinion of a physician is incomplete or illegible, reliance on such a

record may result in remand.  See, e.g., Pratts v. Chater, 94 F.3d 34, 38 (2d Cir. 1996) (finding

that an ALJ's reliance on a "frequently incomplete or illegible" medical record was error

requiring remand); Silva v. Colvin, 2015 WL 5306005, at *5 (S.D.N.Y. Sept. 10, 2015) (finding

an ALJ's decision to award the opinion of plaintiff's treating physician little weight error,

because "virtually all of his treatment notes, are illegible," and made it impossible for the court

to determine whether the ALJ's rationale behind his award of little weight was supported by

substantial evidence).  The ALJ properly recognized that the January 2013 Opinion could not be

considered in its current form and appropriately sought to supplement the record prior to making

a determination regarding Kemp's alleged disability by (1) obtaining a new report from Dr.

Ganem, see R. 908-09, and (2) asking the source of the January 2013 Opinion, plaintiff's

attorney, to promptly provide a legible copy, R. 81-82.  See generally Perez v. Chater, 77 F.3d

41, 47-48 (2d Cir. 1996) (where evidence related to a claimant's treating physician is inadequate,

the Commissioner should recontact the treating physician and determine whether additional

information is available and necessary) (citing 20 C.F.R. § 404.1512(e)).  Although plaintiff's

attorney apparently did not or could not supply a legible copy, Dr. Ganem did supply the critical information requested, and provided a fully legible opinion.

The ALJ was not required to consider portions of the January 2013 Opinion given that it contained so many illegible portions and given the uncertainty regarding whether it had indeed been signed by Dr. Ganem.  Also, the ALJ could not fully assess matters that would have been significant to the weight to be given such an opinion in light of the fact that answers to critical background questions on the form were illegible.[3]  Furthermore, the presumption of "controlling weight" under the Act is only provided to the opinions of a claimant's treating physician, see 20 C.F.R. 404.1527(c)(2), and without confirmation that the January 2013 Opinion was indeed authorized and signed by Dr. Ganem, it was reasonable for the ALJ to not view this opinion as falling within the treating physician regulations at all.

Kemp does not argue that the ALJ failed to provide the October 2013 Opinion appropriate weight under the "treating physician rule."  Accordingly, Kemp's argument that the rule was improperly applied is rejected.

### B.    The ALJ's Credibility Determination

"It is the function of the [Commissioner], not [the reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) (citations omitted). Thus, the ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to discredit the claimant's subjective estimation of the degree of impairment."  Tejada v. Apfel, 167 F.3d 770, 776 (2d Cir. 1999) (summarizing and

---

[3]  One such questions was: "Identify any additional tests or procedures you would advise to fully assess your patient's impairments, symptoms and limitations."  R. 677.

citing with approval a holding in Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y.

1985)).  Nonetheless, when discounting a claimant's credibility regarding his RFC, regulations

impose some burden on the ALJ to explain his decision.  As the Second Circuit has stated:

> When determining a claimant's [residual functional capacity], the ALJ is required
> to take the claimant's reports of . . . limitations into account, 20 C.F.R. § 416.929;
> see McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d
> Cir. 1980), but is not required to accept the claimant's subjective complaints
> without question; he may exercise discretion in weighing the credibility of the
> claimant's testimony in light of the other evidence in the record.  Marcus v.
> Califano, 615 F.2d 23, 27 (2d Cir. 1979).

Genier, 606 F.3d at 49.  To evaluate a claimant's assertion of a limitation, the ALJ must engage

in a two-step process:

> At the first step, the ALJ must decide whether the claimant suffers from a medically
> determinable impairment that could reasonably be expected to produce the symptoms
> alleged.  20 C.F.R. § 404.1529(b). . . .  If the claimant does suffer from such an
> impairment, at the second step, the ALJ must consider 'the extent to which [the
> claimant's] symptoms can reasonably be accepted as consistent with the objective
> medical evidence and other evidence' of record.  Id.  The ALJ must consider
> "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions,
> [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s]
> to medical sources during the course of examination or treatment, or to [the agency]
> during interviews, on applications, in letters, and in testimony in [its] administrative
> proceedings."  20 C.F.R. § 404.1512(b)(3); see also 20 C.F.R. § 404.1529(a); S.S.R.
> 96–7p.

Id. (alterations in original).

The Social Security Administration has issued regulations relating to reports of pain or

other symptoms affecting the ability to work by a claimant for disability benefits.  20 C.F.R.

§§ 404.1529(c)(1), 416.929(c)(1).  These regulations provide, inter alia, that the agency "will not

reject [a claimant's] statements about the intensity and persistence of [his] pain or other

symptoms or about the effect [his] symptoms have on [his] ability to work . . . solely because the

available objective medical evidence does not substantiate [his] statements."  Id.

19

§§ 404.1529(c)(2), 416.929(c)(2).  The regulations also provide that the agency "will consider

whether there are any inconsistencies in the evidence and the extent to which there are any

conflicts between [his] statements and the rest of the evidence."  Id. §§ 404.1529(c)(4),

416.929(c)(4).

Where an ALJ rejects witness testimony as not credible, the basis for the finding

"must . . . be set forth with sufficient specificity to permit intelligible plenary review of the

record."  Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing

Carroll, 705 F.2d at 643); accord Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999).  The ALJ

must make this determination "in light of medical findings and other evidence[] regarding the

true extent of the pain alleged by the claimant."  Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir.

1984) (citation and internal quotation marks omitted).  However, where an ALJ gives specific

reasons for finding the claimant not credible, the ALJ's credibility determination "is generally

entitled to deference on appeal."  Selian, 708 F.3d at 420 (citation omitted).  Thus, "[i]f the

[Commissioner's] findings are supported by substantial evidence, the court must uphold the

ALJ's decision to discount a claimant's subjective complaints."  Aponte v. Sec'y, Dep't of

Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (internal citations omitted); see also

42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive . . . .").

As to the first step, the ALJ determined that Kemp did indeed suffer from certain

medically determinable impairments, and that they "could reasonably be expected to cause the

alleged symptoms."  R. 31.  The ALJ found, however, Kemp's "statements concerning the

intensity, persistence and limiting effects of these symptoms . . . not entirely credible."  Id.

As already described, the ALJ reviewed the medical evidence at length in order to make

20

factual findings regarding Kemp's RFC and credibility.  Kemp takes issue with the fact that, while recognizing that Kemp testified she had left her job due to declining health, the ALJ noted that the timing of this decision fell "during a period of company downsizing," and that after leaving, and after the alleged onset date, Kemp "submitted hundreds of resumes in pursuit of a new position," thus suggesting that Kemp believed she could work.  R. 31-32.  Kemp argues that her actions were consistent with her being disabled because of Kemp's contemporaneous reports of "limiting fatigue" during the period between the "buyout" and her later submission of resumes, and because SSA regulations permit a finding of "disabled" notwithstanding an ability to perform sedentary or light work for older claimants.  See Pl. Mem. at 13, 14.  But the ALJ could rationally conclude that notwithstanding her alleged impairments and fatigue, Kemp still believed she would be able to work at any of the  "hundreds" of jobs she applied for.  R. 31.

Kemp correctly recognizes that her extensive work history of more than 30 years warrants "substantial credibility when claiming an inability to work because of a disability." Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1983) (citing Singletary v. Sec'y of Health Educ. & Welfare, 623 F.2d 217, 219 (2d Cir. 1980)); Pl. Mem. at 14.  Indeed, the regulations provide that a fact-finder will "consider . . . information about [a claimant's] prior work record." 20 C.F.R. § 416.929(c)(3).  Here, the ALJ did not specifically reference Kemp's work history in the context of her credibility determination.  This lacuna, however, does not warrant remand in light of the fact that substantial evidence otherwise supports the ALJ's determination regarding Kemp's credibility.  See, e.g., Wavercak v. Astrue, 420 F. App'x 91, 94 (2d Cir. 2011) ("That [claimant's] good work history was not specifically referenced in the ALJ's decision does not undermine the credibility assessment, given the substantial evidence supporting the ALJ's determination.") (summary order); see also Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012)

("Although it is true that a good work history may be deemed probative of credibility it remains just one of many factors appropriately considered in assessing credibility.") (summary order) (citations and internal quotation marks omitted).  As addressed below, the medical record and Kemp's level of activity do not support her description of the intensity and limiting effects of her impairments.  Therefore the ALJ's failure to reference Kemp's work history in this context does not warrant remand.

Kemp also disputes the ALJ's finding that "the medical records document improvement with treatment."  R. 32; Pl. Mem. at 14-15.  As discussed above, the ALJ determined that Kemp's "diabetes, hypertension, and cardiovascular impairments [had] stabilized," during the relevant period, and that although her "hepatitis C failed to respond to treatment . . . it has never been linked to liver cirrhosis."  R. 32.  These conclusions are supported by the medical evidence in the record.

With regard to her diabetes, there is substantial evidence supporting the ALJ's statement that Kemp's symptoms have been responsive to treatment.  Kemp's diabetes diagnosis significantly predated the alleged onset period.  See R. 261 (noting Kemp's diabetes diagnosis in 2007).  In January 2011, a few months prior to the alleged onset date, Kemp's diabetes was described as "not optimal," and her insulin was increased to bring her glucoses in range.  R. 309.  By April 15, 2011, however, Dr. Randy Stein noted that Kemp's control over her diabetes "appear[ed] to be better," R. 327, and Kemp reported that she had been "dieting more and exercising more," R. 324.  This improvement continued into the relevant period.  R. 411-12 (July 15, 2011, note from Dr. Lori Tindel-Kahn states that Kemp's "diabetic retinopathy [was] stable"); R. 444 (September 2011 note from Dr. Francella states that Kemp's diabetes "has been in good control"); R. 461-65 (September 2011 note from Dr. Stein states that Kemp has had

22

continued control over her diabetes and that Kemp should continue with her current prescriptions); R. 534, 606 (February 2012 and August 2012 notes from Dr. Tindel-Kahn describe Kemp's diabetic retinopathy as "stable," but recommend more exercise). Kemp's improvement with treatment is further supported by what followed the decision to remove metformin from her treatment regimen. In August 2012, Dr. Monahan determined Kemp's diabetes was not under control and instructed her to "stop metformin." R. 613-14. Soon after, however, Dr. Stein noted that Kemp's "glucoses have been out of control since going off metformin." R. 629. These negative effects appear to have partially reversed once Kemp "started on metformin again," in November 2012, with Dr. Stein noting that her "[d]iabetes control [was] improving." R. 844-45. A "Diabetes Management Exam: Foot Exam" performed on Kemp in March 2013 had "normal" findings, R. 743, 748, and on April 3, 2013, Dr. Stein noted that Kemp's control over her diabetes was "still poor" but slightly improved, R. 835. Dr. Stein noted, however, that her poor control over the condition might be linked to a urinary tract infection. Id. To be sure, there are reports from Dr. Ganem that describe Kemp's control over her diabetes as "poor again," R. 875, 893, in which Dr. Ganem recommended more exercise and a low sodium diet, but in light of our deferential review of the ALJ's findings, we cannot say that the ALJ erred in her conclusion that there was overall improvement. More importantly, although Dr. Ganem's 2013 findings suggest Kemp's control over her diabetes had worsened somewhat, neither report suggests that the state of her diabetes affected her RFC. See R. 875, 893. Indeed, Dr. Ganem is the treating physician who specifically opined in October 2013 that Kemp was capable of work-related activities consistent with the ALJ's RFC. See R. 910-15.

Similarly, the ALJ could properly conclude Kemp's hypertension and cardiovascular impairments showed signs of improvement and stabilization during the relevant period. Kemp's

reports of chest pain predated by many years the date when she left her position as an administrative assistant.  See R. 258.  Her reports of pain eventually led to a catheterization procedure, a diagnosis of coronary artery disease ("CAD") in 2007, and the implanting of two stents.  See R. 268.  By January 2011, Dr. Ganem noted that Kemp reported no chest pain.  R. 299, 307.  In June 2011, the month of the alleged onset date, Kemp's blood pressure had improved to 150/80, and she reported "feeling better," with no chest pain or dyspnea.  R. 359, 365.  While Dr. Ganem described Kemp's hypertension as "deteriorated" and her CAD as "unchanged," R. 364, by September 2011, she noted that Kemp's hypertension had "improved," R. 433-34, and that although her CAD was "unchanged," her use of a diuretic had been helpful, id.  There is some evidence that Kemp's symptoms worsened somewhat during 2012.  See, e.g., R. 288-98 (admitting Kemp to the hospital in April 2012 for chest pain, hypertension, and high blood pressure, but noting that there had been "no change of adverse nature" since 2007); R. 641-42 (October 12, 2012, note from Dr. Ganem states that Kemp's blood pressure was very difficult to control and that a second "cardiac catheterization," was recommended to help treat her CAD).  But subsequent examinations reported significant improvement.  See, e.g., R. 657 (In November 2012, Dr. Lathan notes that Kemp's heart had a "[r]egular rhythm"); R. 883-84 (May 29, 2013, examination by Dr. Ganem showed Kemp's hypertension had "improved"); R. 875-76 (August 28, 2013, note from Dr. Ganem states that Kemp's chest pain was "likely non cardiac").  And, of course, Dr. Ganem found that notwithstanding any of these matters, Kemp was capable of work-related activities consistent with the ALJ's RFC analysis.  Compare R. 910-15, with R. 28.

Kemp also argues that the ALJ erred in her assessment of Kemp's hepatitis C.  Pl. Mem. at 15.  Although Kemp concedes that the ALJ was correct in describing her hepatitis C as "never

[having] been linked to liver cirrhosis," R. 32, she argues that the mere fact that "[Kemp] did not

have cirrhosis does not prove her condition was not as limiting as alleged," Pl. Mem. at 15.  In

her review of the record, the ALJ recognized that Kemp's "hepatitis C failed to respond to

treatment," R. 32; see also R. 679, but, notwithstanding this fact, found the lack of cirrhosis

weighed against the degree of limitation Kemp described.  The ALJ's conclusion that Kemp's

hepatitis C did not affect her RFC is supported by evidence in the record.  Compare R. 48 (Kemp

testified that her hepatitis C led to "bathroom issues."), with R. 304-07 (January 2011 report

noting Kemp's liver/spleen had "no enlargement," her abdomen was "soft and non-tender

without guarding or rebound," and that she "[d]enie[d] change in bowel habits, abdominal

pain"), R. 346, 349 (June 3, 2011, examination showing "normal bowel sounds; no masses, no

bruit," and "no enlargement or nodularity" of liver or spleen), R. 431-34 (September 9, 2011,

note that Kemp denies change in bowel habits or abdominal pain), R. 900-03 (same on October

26, 2012), and R. 891-94 (May 8, 2013, report noting change in bowel habits and abdominal

pain, but denying vomiting, diarrhea, or blood in stool).  Kemp points to no evidence in the

record to suggest that the symptoms of her hepatitis C created the severe limitations she alleged,

and, as discussed next, the ALJ found that, notwithstanding her hepatitis and other impairments,

Kemp maintained the ability to engage in "full and varied activities." R. 32.

Lastly, Kemp contends that the ALJ erred in finding that she "remained able to pursue

full and varied activities despite her impairments."  Pl. Mem. at 15 (citations and internal

quotation marks omitted).  She argues that many of the activities were "basic self-care

activities," Pl. Mem. at 17, and that the more physically demanding activities were sporadic,

which "cannot logically be counted as evidence belying the credibility of her allegations," id. at

16.  However, as the ALJ discussed, Kemp maintained the ability throughout the relevant period

to sit for a plane flight, stand in line, walk, drive a car, maintain her hygiene, knit, and prepare

meals.  R. 26, 32; <u>accord</u> R. 207-09, 653.[4]   In May 2012 she flew across the country to meet her

birth father and later traveled to New Jersey to attend her son's wedding.  R. 32, 57.  The ability

to perform such activities is relevant to the ALJ's determination of credibility regarding the

severity of subjective complaints and supports the ALJ's determination that Kemp could perform

her past work.  <u>See</u> <u>Rivera v. Harris</u>, 623 F.2d 212, 216 (2d Cir. 1980) (ALJ's determination that

claimant was not entirely credible was supported by substantial evidence where, among other

things, claimant testified she could "cook, sew, wash and shop," as long as she moved slowly

and took an afternoon rest); <u>accord</u> <u>Diaz v. Colvin</u>, 2015 WL 4402941, at *15 (S.D.N.Y. July 19,

2015) (substantial evidence supported ALJ's finding that claimant was not credible, where,

among other things, claimant was able to perform "light cleaning, laundry, shopping, cooking,

and song-and poetry writing").

     In sum, substantial evidence supports the ALJ's credibility determination.

     C.    <u>Kemp's Ability to Perform Past Work</u>

     Kemp argues that the ALJ erred in concluding that she could perform her past work as an

administrative assistant as generally performed in the national economy.  Pl. Mem. at 17.  But

the basis for her argument is that "none of the hypothetical questions the ALJ posed to the

---

    [4] Kemp contends that her ability to knit should not have been a factor in the ALJ's
credibility determination, because "Kemp [did] not allege severe hand problems."  Pl. Mem. at
17.  Kemp did, however, state at the administrative hearing that she had problems closing her
hand into a fist, R. 64-65, and also stated in an "Function Report" that her impairments
prevented her from "typ[ing] . . . [and] writ[ing] w/o my hand cramping," R. 207.  These
impairments would have affected Kemp's ability to perform her past relevant work as an
administrative assistant.  <u>See</u> R. 71-75 (noting that Kemp's past work involved "lots of typing").
Accordingly the ALJ appropriately considered Kemp's ability to knit in her evaluation of
Kemp's credibility.  R. 32.

[vocational expert] corresponded with the RFC the ALJ eventually adopted." Id.  It is certainly true that the ALJ posed hypothetical questions to the vocational expert based on some of the legible restrictions appearing in the January 2013 Opinion.  Compare R. 75-80, with R. 673-78. But it is also true that the ALJ did not rely on those responses in making his determination at Step 4.  This course of action was certainly understandable given that the hypothetical questions posed to the vocational expert were based on the January 2013 Opinion, which the ALJ later rejected.  Instead, the ALJ determined that Kemp could perform sedentary work as was clearly reflected in Dr. Ganem's October 2013 opinion.  R. 910-15.  The vocational expert testified that Kemp's past relevant work as an administrative assistant was a "sedentary strict level" position. R. 75.  She testified that such a position provided skills that would transfer across many types of "sedentary work," which she described as "[c]lerk positions."  R. 76.  The ALJ compared Kemp's RFC with the exertional requirements of Kemp's past relevant work, described by the vocational expert as "sedentary, skilled work" under section 169.167-010 of the Dictionary of Occupational Titles.  R. 33.  Accounting for the limitations in her RFC, the ALJ found Kemp's limitations did not prevent her from performing this past relevant work.  R. 33.  Given the RFC determination made by the ALJ, testimony from a vocational expert on this question was not necessary.  Burgen v. Colvin, 2014 WL 7408273, at *14 (N.D.N.Y. Dec. 30, 2014) (vocational expert "did not need to be questioned" where the claimant's "prior work and present abilities were obvious" and claimant was "found capable of performing his past relevant work.") (citations omitted); accord Pasarell v. Colvin, 2013 WL 4647192, at *10 (S.D.N.Y. Aug. 29, 2013) (not necessary to consult a vocational expert where ALJ had determined that claimant could perform her past relevant work) (citations omitted).

Kemp briefly argues that because the ALJ found that Kemp was limited to only

"occasional" operation of a motor vehicle, the ALJ's decision is faulty because she made no explicit finding that such a limitation was consistent with Kemp's past relevant work. Pl. Mem. at 18. But Kemp provides no argument as to why her past work would require more than the occasional operation of a motor vehicle – assuming it required any operation of a motor vehicle whatsoever. There was no testimony from Kemp stating otherwise. Indeed, Kemp described her job at length during the hearing and there was no mention made of any driving. R. 72-74. The job description of the "DOT code" provided by the vocational expert, R. 75, similarly makes no mention of the operation of a motor vehicle, see United States Department of Labor Office of Administrative Law Judges Law Library, Dictionary of Occupational Titles (4th ed. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT01E.HTM ("169.167-010 ADMINISTRATIVE ASSISTANT"). Thus, the fact that Kemp was limited in her operation of a motor vehicle had no relevance to the ALJ's determination that she could do her past relevant work.

IV.    CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Docket # 23) is granted, and Kemp's motion for judgment on the pleadings (Docket # 16) is denied. The Clerk is requested to enter judgment.

Dated: September 9, 2016
        New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

28